# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN L. RUSH, et al.,       )

                         )    Case No. 1:21-cv-00316

       *Plaintiffs*,     )

                         )    District Judge Arthur J. Schwab

       v.             )    Magistrate Judge Kezia O. L. Taylor

                         )

JOHN E. WETZEL, et al.,    )

                         )

       *Defendants*.   )

## <u>MEMORANDUM OPINION</u>

This case involves a challenge to the Pennsylvania Department of Corrections ("DOC") policy of instituting segregated housing and other related restrictions based on vaccination status during the Covid-19 pandemic. Plaintiffs in this case are all adult state prisoners who currently are, or have been, housed at SCI-Forest, are unvaccinated for Covid-19 and were subject to the DOC's segregation policy.

The Defendants in this action are DOC officials. They filed a partial Motion to Dismiss, which the Court granted on May 15, 2023. *See* ECF Nos. 127, 129. As a result of that Order granting the partial Motion to Dismiss, the sole remaining claims in this action by the twenty-six remaining Plaintiffs[1] are (1) a procedural due process violation claim and (2) a claim against the

---

[1] While the case was initially brought by forty-four Plaintiffs proceeding *pro se*, *see* ECF No. 44, the Court directed the Clerk of Court to find *pro bono* counsel wiling to represent the Plaintiffs due to their numerosity and the nature of their allegations at the time their Complaint was filed. *See* ECF Nos. 48, 52. Counsel graciously accepted representation and eventually filed an Amended Complaint on behalf of the forty-four Plaintiffs. *See* ECF Nos. 87, 88, 104. However, eighteen of those forty-four Plaintiffs did not return signed engagement letters, so counsel eventually withdrew their appearance on behalf of those Plaintiffs and the Court later entered an order dismissing them from this action without prejudice. *See* ECF Nos. 116, 117, 123, 124. Counsel also eventually withdrew their appearance on behalf of one additional Plaintiff, Randy Anderson, who elected to proceed in this action *pro se*. *See* ECF Nos. 148, 149. Counsel therefore represents twenty-five of the original forty-four Plaintiffs, and those Plaintiffs will hereinafter be

Defendants in their official capacities for prospective injunctive relief. *Id.* As it relates to the procedural due process claim, the Plaintiffs' Amended Complaint asserts that "Defendants denied [them] their right to procedural due process by, among other things, confining them to near solitary confinement without basis and without presenting Plaintiffs an opportunity to challenge the confinement." ECF No. 104 ¶ 56. Plaintiffs seek an injunction to enjoin Defendants from enforcing the policy of segregating and imposing restrictions on inmates based on vaccination status. *Id*. at 11.

Pending for review are the following motions and briefs, and their corresponding responsive filings:

1. Defendants' Motion for Summary Judgment, ECF No. 168, Brief in Support thereof, ECF No. 169, Concise Statement of Material Facts, ECF No. 170, and Appendix, ECF No. 171. Represented Plaintiffs' Brief in Opposition to the Motion for Summary Judgment, ECF No. 196, their Responsive Concise Statement and Statement of Additional Material Facts, ECF No. 195, and Appendix, ECF No. 197. Defendants' Reply to Represented Plaintiffs' Brief in Opposition, ECF No. 198. *Pro se* Plaintiff Anderson's Brief in Opposition to the Motion for Summary Judgment, ECF No. 193, and his Response to Defendants' Concise Statement of Material Facts, ECF No. 206.

2. *Pro se* Plaintiff Anderson's Motion for Summary Judgment, ECF No. 173, and Defendants' Response thereto, ECF No. 176.

3. Represented Plaintiffs' Motion to Enforce Settlement Agreement, ECF No. 189, and Defendants' Response in Opposition thereto, ECF No. 192.

For the reasons that follow, the Represented Plaintiffs' Motion to Enforce Settlement Agreement will be denied, Defendants' Motion for Summary Judgment will be granted and *pro se* Plaintiff Anderson's Motion for Summary Judgment will be denied.

---

referred to as the "Represented Plaintiffs" while Plaintiff Randy Anderson will be referred to as "*pro se* Plaintiff Anderson." Collectively they will be referred to as "Plaintiffs."

A. **Motion to Enforce Settlement Agreement**

As an initial matter, the Court will address the Represented Plaintiffs' pending Motion to Enforce Settlement Agreement. The Represented Plaintiffs seek an order enforcing the settlement agreement that was allegedly agreed to in principle in or about April 2024, but the Defendants dispute that a settlement was ever completely reached or entered into by the parties and therefore maintain that there is no settlement to be enforced. The Court finds that it need not determine whether such a settlement agreement exists because, even if the parties did enter into such an agreement, the Prison Litigation Reform Act ("PLRA") bars this Court from ordering enforcement of it.

The PLRA, as codified in 18 U.S.C. § 3626, comprehensively revised the rules of injunctive litigation in prison condition cases, including setting a standard governing the term of prison injunctions and other prospective relief and requiring courts to make findings about the relationship between prospective relief provisions and the legal violations that they are intended to correct. Neither the Represented Plaintiffs' counsel nor Defendants' counsel discusses the PLRA's application to the Motion, but the Court must do so because the PLRA expressly addresses the remedies available to a party that is alleging, as the Represented Plaintiffs are here, that a private settlement agreement should be enforced.

The PLRA provides that private settlement agreements that involve prospective relief, such as the one in which the Represented Plaintiffs argue was entered into in this case, lack any judicial enforcement in federal court "other than the reinstatement of the civil proceeding that the agreement settled." 18 U.S.C. § 3626(c)(2)(A). That is because under the PLRA, injunctive settlements must meet the standards and finding requirements of 18 U.S.C. § 3626(a) in order to

be enforceable in federal court. This means that the court must find that the settlement is narrowly drawn, necessary to correct federal law violations, and the least intrusive way to do so. 18 U.S.C. § 3626(a)(1)(A).[2]  Settlements that satisfy the PLRA's standards and finding requirements are entered by the court as consent decrees and are judicially enforceable by that court. *Id*. § 3626(c)(1).[3]  *See also Ingles v. Toro*, 438 F. Supp. 2d 203, 214-15 (S.D.N.Y. 2006); Honorable Harold Baer, Jr., Arminda Bepko, *A Necessary and Proper Role for Federal Courts in Prison Reform: The Benjamin v. Malcolm Consent Decrees*, 52 N.Y.L. Sch. L. Rev. 3, 51-55 (2008) (available on Westlaw).

The PLRA does not prevent parties from reaching private settlement agreements, but such agreements are not subject to the district court's enforcement "other than the reinstatement of the civil proceeding that the agreement settled." *Id*. § 3626(c)(2)(A);[4] *see also id*. § 3626(g)(6) (defining private settlement agreement as "an agreement entered into among the parties that is not

---

[2] Section 3626(a)(1)(A) provides: "Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The Court *shall not grant or approve any prospective relief* unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.") (emphasis added). The PLRA defines "prospective relief" as "all relief other than compensatory monetary damages." 18 U.S.C. § 3626(g)(7). It defines "relief" as "all relief in any form that may be granted or approved by the court, and includes consent decrees but does not include private settlement agreements." *Id*. § 3626(g)(9).

[3] Section 3626(c)(1) provides: "In any civil action with respect to prison conditions, the court shall not enter or approve a consent decree unless it complies with the limitations on relief set forth in subsection (a)."

[4] Section 3626(c)(2)(A) provides: "Nothing in this section shall preclude parties from entering into a private settlement agreement that does not comply with the limitations on relief set forth in subsection (a), *if the terms of that agreement are not subject to court enforcement other than the reinstatement of the civil proceeding that the agreement settled*."  (Emphasis added).

subject to judicial enforcement other than the reinstatement of the civil proceeding that the agreement settled[.]") *Ingles*, 438 F. Supp. 2d at 214-15 (critiquing the inability of a federal court to enforce a private settlement agreement in a case governed by the PLRA). Thus, assuming there was a settlement agreement reached between the parties, the PLRA bars this Court from enforcing it.[5] As such, the Represented Plaintiffs' Motion will be denied.

### B. <u>Relevant Factual Background</u>

The following facts are taken from the parties' concise statements of material facts, and responses thereto, and are undisputed unless otherwise indicated. The Court notes, however, that Defendants failed to file a responsive concise statement of material facts to the Represented Plaintiffs' additional material facts at issue. Those facts will therefore be deemed admitted unless they were otherwise disputed elsewhere in the Defendants' concise statement. *See* LCvR 56.E; *Enigh v. Miller*, Civil No. 08-1726, 2010 WL 2926213 (W.D. Pa. July 23, 2010) (collecting cases).

SCI Forest is located in Marienville, Pennsylvania and is comprised of a 64-acre compound with 26 buildings including 11 housing units, three inmate dining halls, a hospital, both law and regular libraries, an educational and religious complex, two large recreational yards and individual recreation areas for each housing unit. ECF No. 195 ¶ 69. It offers both academic and vocational programs. *Id*. ¶ 70. Defendant Oberlander began as Superintendent at SCI-Forest in March 2019

---

[5] A plaintiff who wishes to litigate a claim that a private agreement was breached may file a breach of contract claim in state court. *See* 18 U.S.C. § 3626(c)(2)(B) ("Nothing in this section shall preclude any party claiming that a private settlement agreement has been breached from seeking in State court any remedy available under State law."); *Ghana v. New Jersey State Parole Bd.*, No. 01-cv-1620, 2011 WL 3608633, at *3 (D.N.J. Aug. 15, 2011) (under the PLRA, "if a settlement agreement is not by way of consent decree, a party asserting a breach of that settlement agreement is limited to moving for reinstatement of the action in federal court or filing an action in state court for breach of contract.") (internal quotations omitted); *Ingles*, 438 F. Supp. 2d at 215.

and retired from the DOC in June 2022.  ECF No. 170 ¶ 1.  Defendant Irwin replaced Oberlander as Superintendent in June 2022.  *Id*. ¶ 2.

Prior to the Covid-19 pandemic, SCI-Forest's daily schedule permitted inmates access to, among other things, communal dining halls, main yard, concrete yard, dayroom (with both A and B sides of a block together for two hours in the morning, afternoon, and evening), the law library (up to 3 slots per week), schooling and programming.  ECF No. 195 ¶ 71.  When SCI-Forest called concrete yard, both sides of a block, approximately 240 people, could go out to the concrete yard or the day room at the same time.  *Id*. ¶ 72.  In response to the pandemic, however, SCI-Forest instituted a new daily schedule that restricted the number of inmates permitted to go to the concrete yard and day room at a time.  *Id*. ¶¶ 73-74.  Following the institution of this new schedule, only one side of a pod was permitted to go out - half of one side would go to concrete yard while the other half stayed in the day room.  *Id*. ¶ 74.  As a result, no more than 60 people were in an area at a time.  *Id*.  Additionally, communal dining and contact visits for all inmates stopped and staff were required to do temperature screenings, check for symptoms, and wear masks.  ECF No. 170 ¶¶ 13-14, 16.

Covid-19 vaccines were first made available to inmates at SCI-Forest on or about April 8, 2021, but inmates were not required to receive the vaccine.  *Id*. ¶¶ 5-6.  In early August 2021, inmates were informed that their failure to receive a vaccine would "impact their movement," and inmates who chose not to receive the vaccine were advised that they would be housed in a separate unit from the inmates who did receive the vaccine.  *Id*. ¶ 20.  On or about August 4, 2021, DOC Central Office mandated that unvaccinated prisoners be placed under segregation in a housing unit

separate from vaccinated prisoners to minimize their risk of exposure to Covid-19.[6]  *Id*. ¶ 8.  On that day, Defendant Oberlander recorded a video that was shown to inmates at SCI-Forest informing them that Central Office gave the direction to separate vaccinated and unvaccinated inmates due to the Delta variant surge.  *Id*. ¶ 22.  Mini town halls were conducted with the unvaccinated inmates on August 4, 2021 and August 5, 2021, and a second video, recorded by Defendant Wetzel, was shown to the inmates on August 5, 2021, explaining what was going to occur with the unvaccinated inmates – specifically, that they would no longer be able to have in-person contact visits or work in their employment and that their out of cell time would be less than that of inmates who received the vaccine.  *Id*. ¶¶ 22-23; ECF No. 195 ¶ 88.

On August 5, 2021, SCI-Forest conducted a vaccination clinic, during which 185 previously unvaccinated inmates elected to receive the vaccine.  *Id*. ¶ 19.  The following day, on August 6, 2021, general population inmates at SCI-Forest who remained unvaccinated were moved to the A pod of G unit ("GA unit").[7]  *Id*. ¶ 10.  On or about August 9, 2021, there were approximately 60 unvaccinated general population inmates who were housed on GA unit.  *Id*. ¶ 28.

---

[6] According to Defendant Oberlander, Central Office made the decision to segregate inmates based upon vaccination status because "that was the time frame when contact visits were getting ready to start back up and that there was a concern with the numbers of Delta variant cases."  ECF No. 195 ¶ 80.  He did not recall providing input on the policy to separate vaccinated and unvaccinated inmates, although he did admit that Central Office would sometimes ask him for his input into policy decisions for policies.  *Id*. ¶ 79.

[7] Unvaccinated inmates who later elected to receive the vaccine could put in a request or speak to their unit team to be moved off the unvaccinated unit.  ECF No. 170 ¶ 24.  However, it is either not known or it is disputed how quickly the transition actually occurred after the request was made by the inmate.  ECF No. 195 ¶¶ 24, 92

To minimize their risk of exposure, unvaccinated inmates could not be in a class, programming, or religious services with vaccinated inmates. *Id*. ¶ 26. Unvaccinated units operated as their own zone based on the risk for Covid-19 to keep that population safe. *Id*. GA unit was on a 32-person cohort unless the risk level moved to yellow (16-person cohort) or red (4-person cohort) based on the estimated immunity rate. *Id*. ¶ 27. Notably, however, there was no requirement for any staff member to be vaccinated before working on either the vaccinated or unvaccinated unit. ECF No. 195 ¶ 94. Both vaccinated and unvaccinated staff were allowed to work on any unit. *Id*. ¶ 97. However, staff who chose not to receive the vaccine had mandatory weekly Covid-19 tests. ECF No. 170 ¶ 16. Also of note, while contact visits resumed for vaccinated inmates in August 2021, visitors participating in contact visits only had to affirm, but did not have to show proof, that they were vaccinated in order to visit. *Id*. ¶¶ 14-15.

When inmates tested positive for Covid-19 they were placed in insolation, regardless of their vaccination status. *Id*. ¶ 18. There was no difference in how a Covid-19 positive inmate was treated with regard to whether they were vaccinated or unvaccinated, the isolation practice for positive cases remained the same. *Id*.

The Weekly Leadership Update email sent to DOC Leadership on August 5, 2021, stated that "[u]nvaccinated status will not impact an inmate's access to services." *Id*. ¶ 25. Plaintiffs, however, dispute that their access to services was not limited by their unvaccinated status and maintain that they "were treated worse than vaccinated inmates and endured heightened restrictions on their freedoms and confinement." ECF No. 195 ¶ 25.

The parties note the following differences in the conditions of confinement between vaccinated and unvaccinated inmates at SCI-Forest during the time the segregation policy was in place.

**Out of cell time:** Unvaccinated inmates had less out of cell time than their vaccinated counterparts and during the time that they were out of their cells they were kept away from vaccinated inmates to minimize infections. ECF No. 170 ¶ 31; ECF No. 195 ¶¶ 31, 101, 105. Although the exact amount of time unvaccinated inmates were confined to their cells per day appears to be a matter of dispute between the parties, it is agreed that they had access to either two or three hours of out of cell time a day, depending on what they signed up for, with a potential for four hours a day beginning in January 2022. ECF No. 170 ¶¶ 29-30, 32; ECF No. 195 ¶¶ 29, 102, 106-107. To minimize potential Covid-19 exposure, unvaccinated inmates had their outdoor yard time in a different yard and not the primary Main Yard. ECF No. 170 ¶ 29; ECF No. 195 ¶ 109.

**Visitation:** Unvaccinated inmates were not permitted to have in-person contact visits. ECF No. 170 ¶ 41; ECF No. 195 ¶¶ 41, 111. Defendants maintain that unvaccinated inmates had increased non-contact video visits, as well as daily phone access and access to email, but the Represented Plaintiffs dispute whether unvaccinated inmates received the same time allotment on video calls as vaccinated inmates received for contact visits.[8] ECF No. 170 ¶ 41; ECF No. 195 ¶¶ 41, 112-115. In-person visits for all inmates were suspended during the Omicron variant surge from January 27, 2022, to February 28, 2022. ECF No. 170 ¶ 44. During that time, the DOC

---

[8] It is undisputed that for approximately sixteen months, the DOC provided one free phone call per week and free cable to all inmates. ECF No. 170 ¶ 35. When those services were discontinued, free emails continued as did twelve free first-class letters per month. *Id*.

provided all inmates with free weekly snack bags, free cable for the month of February, and two free phone calls per week from January 24, 2022, to March 31, 2022. *Id*.

**Programming and services:** Starting on August 15, 2021, programming and services for unvaccinated inmates were delivered in-cell, as opposed to in-person for vaccinated inmates. ECF No. 170 ¶ 36; ECF No. 195 ¶¶ 103, 118-19, 123. Unvaccinated inmates received educational and programming materials delivered to their cells, which they would work on and then return. ECF No. 170 ¶ 37.

**Law library:** A law library kiosk terminal was installed on GA unit on August 9, 2021. ECF No. 170 ¶ 34. Unvaccinated inmates were still permitted to access the law library as long as the cohort did not exceed 32 and contained only inmates from GA unit, but Defendant Oberlander could not confirm that they were able to access the law library for the same amount of time as vaccinated inmates. ECF No. 170 ¶ 34; ECF No. 195 ¶¶ 34, 116.

**Religious activities:** Unvaccinated inmates were not allowed to participate in in-person religious activities, although chaplains from religious services made regular rounds and religious services were played on the inmate television channel for GA unit. ECF No. 170 ¶ 38.

**Employment:** Unvaccinated inmates were not permitted to work off GA unit as part of the effort to minimize their exposure outside of their cohorts, but Defendants maintain that they largely kept their job assignment and their rate of pay if they worked on GA unit. ECF No. 170 ¶ 48. Defendants maintain that unvaccinated inmates who were not able to work as a result of the segregation policy were still provided with their regular pay and were able to resume working if they chose to become vaccinated. ECF No. 170 ¶ 47. The Represented Plaintiffs dispute this fact and maintain that their employment and pay was negatively affected. ECF No. 195 ¶¶ 47, 120.

On April 4, 2022, the DOC began to eliminate unvaccinated units and to integrate unvaccinated inmates in with the vaccinated population as cell space became available. ECF No. 170 ¶ 49. Thus, the restrictions that were in place as part of the segregation policy for unvaccinated inmates were lifted once the policy was over on April 4, 2022. *Id*. ¶ 50. On this day, unvaccinated inmates were permitted to return to their previous work location at their previous rate of pay, be transported with vaccinated inmates, and participate in programming, education, and religious services off the unit. *Id*. ¶ 51. Starting on April 18, 2022, families were permitted to schedule visits with unvaccinated inmates. *Id*. ¶ 53. After April 2022, there were no differences in how vaccinated and unvaccinated inmates were assigned housing units or treated. *Id*. ¶ 54. However, the Represented Plaintiffs maintain that Defendant Irwin has continued the restrictions that were in place during the segregation mandate and that programming and services remain limited. ECF No. 195 ¶¶ 50-51, 54, 126. They do not, however, set forth any specific continued restrictions still in progress at SCI-Forest, and it appears that, to the extent any may remain, they affect all inmates regardless of vaccination status. For example, it is undisputed that the chow-hall remains closed to all inmates. ECF No. 170 ¶ 13.

## C. **Legal Standard**

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A disputed fact is "material" if proof of its existence or nonexistence would affect

the outcome under applicable substantive law.  *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Loc. 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).  When determining whether a genuine issue of material fact remains for trial, the court must view the record and all reasonable inferences to be drawn therefrom in favor of the nonmoving party.  *Moore v. Tartler*, 986 F.2d 682, 685 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988).  To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings.  Instead, once the movant satisfies its burden of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party must go beyond his or her pleadings with affidavits, depositions, answers to interrogatories or other record evidence to demonstrate specific material facts that give rise to a genuine issue.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### D. **Discussion**

#### 1. **Exhaustion of administrative remedies**

Defendants move for summary judgment against all Plaintiffs, other than Plaintiffs Rush and Hall, on the basis that these Plaintiffs did not properly exhaust their administrative remedies under the PLRA prior to filing this lawsuit. The failure to exhaust administrative remedies "is an affirmative defense the defendant must plead and prove." *Small v. Camden County*, 728 F.3d 265, 268 (3d Cir. 2013).

Congress enacted the PLRA in 1996 in the wake of a sharp rise in prisoner litigation in the federal courts. *See Woodford v. Ngo*, 548 U.S. 81, 84 (2006). As part of the PLRA, prisoners are required to first exhaust all administrative remedies as are available prior to bringing an action with respect to prison conditions pursuant to 42 U.S.C. § 1983, or any other federal law. *See* 42 U.S.C. § 1997e(a); *see also Porter v. Nussle*, 524 U.S. 516, 524 (2002) (exhaustion also mandatory for *Bivens* suits brought by federal prisoners). Specifically, the act provides in pertinent part as follows:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Exhaustion is mandatory under this provision regardless of the type of relief sought and the type of relief available through administrative procedures. *See Booth v. Churner*, 532 U.S. 731, 741 (2001). In addition, the exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532.

The PLRA also mandates that inmates "properly" exhaust administrative remedies before filing suit in federal court. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjunctive system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90-91. Importantly, "these procedural requirements are drawn from the policies of the prison in question rather than any free-standing federal law." *Shifflett v. Korszniak*, 934 F.3d 356, 364 (3d Cir. 2019); *see also Drippe v. Tobelinksi*, 604 F.3d 778, 781 (3d Cir. 2010) ("the determination whether a prisoner properly exhausted a claim is made by evaluating compliance with the prison's specific grievance procedures.")

There is only a single qualifier to the PLRA's mandatory exhaustion requirement – administrative remedies must be "available". *Ross v. Blake*, 578 U.S. 632, 639 (2016). In this context, "available" means "capable of use to obtain some relief for the action complained of." *Id.* at 642 (cleaned up). The Supreme Court has stated that a prison's internal grievance process is not "available" if, for example, (1) "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates," (2) it is "so opaque that it becomes, practically speaking, incapable of use" because "no ordinary prisoner can discern or navigate it," or (3) "prison administrators thwart inmates from taking advantage of [it] through machination, misrepresentation, or intimidation." *Id*. at 643-44. Additionally, the Third Circuit has held that "as soon as a prison fails to respond to a properly submitted grievance or appeal within the time limits prescribed by its own policies, it has made its administrative remedies unavailable and the prison has fully discharged the PLRA's exhaustion requirement" but only as to the matters complained of and the relief sought in the grievance. *Shifflett*, 934 F.3d at 365.

However, absent a situation where administrative remedies are not "available," a court may not excuse an inmate's failure to exhaust "irrespective of any 'special circumstances.'" *Ross*, 578 U.S. at 639.

The Pennsylvania DOC has an official Inmate Grievance System that governs the grievance and appeals process in Pennsylvania correctional institutions like SCI-Forest. *See* 37 Pa. Code § 93.9. The Inmate Grievance System is set forth in DC-ADM 804[9], which provides for three stages of grievance review: (1) Initial Review (DC-804 § 1(C)), (2) Appeal to Facility Manager (DC-ADM 804 § 2(A)), and (3) Appeal to Final Review, which is the Secretary's Office of Inmate Grievance and Appeals ("SOIGA") (DC-ADM 804 § 2(B)).

The parties do not dispute that the only Plaintiffs in this matter to have filed Covid related grievances that were appealed to SOIGA are Plaintiffs Rush and Hall and that all other Plaintiffs either did not file a Covid related grievance, or, if they did, they did not appeal the denial of their grievance to SOIGA. ECF No. 170 ¶¶ 62-65; ECF No. 195 ¶¶ 62-65. What the parties do dispute is whether all Plaintiffs other than Rush and Hall can be considered to have properly exhausted through Plaintiffs Rush and Hall, and whether, pursuant to the recent Supreme Court case of *Perttu v. Richards*, 605 U.S. 460 (2025), the exhaustion of administrative remedies under the PLRA may be a question of fact for the jury to decide in this case. The Court will address each of these arguments.

First, noting that the claims in this action are identical in law and fact as they relate to all the Plaintiffs in this action, Plaintiffs argue that requiring every one of them to exhaust their

---

[9] The DOC's policies and procedure manuals are found on the Pennsylvania Department of Corrections website at www.cor.pa.gov.

administrative remedies would have been futile and proper exhaustion should therefore be attributed to all of them through the exhaustion of administrative remedies by Plaintiffs Rush and Hall. *See* ECF No. 196 at 11-13. Essentially, Plaintiffs argue in favor of the application of vicarious exhaustion.

To date, the Third Circuit has not had the occasion to address this issue, but other circuits have held that vicarious exhaustion may be permitted in civil rights cases where the prisoner plaintiffs are certified as a class under Federal Rule of Civil Procedure 23. *See*, *e.g.*, *Chandler v. Crosby*, 379 F.3d 1278, 1287 (11th Cir. 2004) (holding that "a class of prisoner-plaintiffs certified under Rule 23(b)(2) satisfies the PLRA's administrative exhaustion requirement through 'vicarious exhaustion,' i.e., when 'one or more class members ha[s] exhausted his administrative remedies with respect to each claim raised by the class.'") (alteration in original); *Gates v. Cook*, 376 F.3d 323, 330 (5th Cir. 2004) (concluding that one plaintiff's satisfaction of the Mississippi Department of Corrections' Administrative Remedy Program was "enough to satisfy the requirement for the class"). District courts in other circuits, including the Third Circuit, have also held that exhaustion of administrative remedies by one class member is sufficient to satisfy the PLRA's exhaustion requirement for the entire class. *See*, *e.g.*, *Barfield v. Cook*, No. 3:18-cv-1198 (MPS), 2019 WL 3562021, at *8 (D. Conn. Aug. 6, 2019) (finding that the exhaustion requirement was satisfied as to all class members due to the exhaustion of administrative remedies by two plaintiffs); *Chimenti v. Wetzel*, No. 15-333, 2018 WL 2388665, at *5 (E.D. Pa. May 24, 2018) (agreeing with the Eleventh Circuit's reasoning in *Chandler*); *Scott v. Clarke*, 64 F. Supp. 3d 813, 832 n.10 (W.D. Va. 2014) (concluding that the efforts of the named plaintiffs and several other class members, who fully exhausted their prison medical grievances, "easily support[ed] a finding

of PLRA exhaustion on behalf of the entire class" under the principle of vicarious exhaustion); *Butler v. Suffolk County*, 289 F.R.D. 80, 97 (E.D.N.Y. 2013) (finding the PLRA's exhaustion requirement satisfied as to the entire class where the class representatives exhausted their administrative remedies as to allegedly unconstitutional conditions).

In this case, however, Plaintiffs are not proceeding as a class because they did not seek class certification under Rule 23.  The Tenth Circuit and numerous district courts that have addressed PLRA exhaustion by plaintiffs not proceeding as a class have found that vicarious exhaustion cannot be applied in such situations and exhaustion of administrative remedies by one prisoner does not meet the exhaustion requirement for all the plaintiffs.  *See McGoldrick v. Werholtz*, 185 F. App'x 741, 743-44 (10th Cir. June 22, 2006) ("vicarious exhaustion" cannot be applied when plaintiffs are not certified as a class); *see also*, *e.g.*, *McFadden v. Fuller*, No. 2:13-2290-JMC, 2013 WL 6182365, at *3 (D.S.C. Nov. 22, 2013) (noting that the PLRA requires that each plaintiff meet the exhaustion requirement in action where prisoners join as plaintiffs and distinguishing case where exhaustion was not required because the plaintiffs were certified as a class); *Jones v. Corzine*, No. 09-4406 (JLL), 2010 WL 1948352, at *11 n.12 (D.N.J. May 14, 2010) ("Exhaustion of administrative remedies by one prisoner does not meet the exhaustion requirement for multiple prisoner plaintiffs seeking to join in one action[.]"); *Lilly v. Ozmint*, No. 2:07-01932-JF, 2007 WL 2022190, at *2 (D.S.C. July 11, 2007); *Worthen v. Oklahoma Dept. of Corrections*, No. CIV-07-687-R, 2007 WL 4563665, at *3 (W.D. Okla. Dec. 7, 2007), *report and recommendation adopted in pertinent part by* 2007 WL 4563644 (W.D. Okla. Dec. 20, 2007); *Ray v. Evercom Systems, Inc.*, No. 4:05-2904-RBH, 2006 WL 2475264, at *5 (D.S.C. Aug. 25, 2006).

Even though all Plaintiffs in this action are similarly situated and the remaining claims are identical as to each of them, and despite the purported purpose and goals behind PLRA's exhaustion requirement being satisfied here through the exhaustion of administrative remedies by Plaintiffs Hall and Rush, the PLRA is clear that its mandatory exhaustion requirement applies to all prisoners. The Court therefore declines to extend the applicability of the vicarious exhaustion exception to this case given its absence of class certification. Additionally, to the extent any such argument is being raised by the Plaintiffs, the Court rejects recognizing a futility exception to exhaustion in this case since such exception has been explicitly rejected by the Third Circuit. *See Ahmed v. Dragovich*, 297 F.3d 201, 206 (3d Cir. 2002) (citing *Nyhuis v. Reno*, 204 F.3d 65, 78 (3d Cir. 2000)).

The second argument raised by Plaintiffs concerns the applicability of *Perttu*, 605 U.S. 460, a case where the Supreme Court addressed whether an inmate had a right to a jury trial on PLRA exhaustion when the question was intertwined with the merits of the underlying claim. *See* ECF No. 202. There, a prisoner sued a prison employee "for violating his constitutional rights, including his First Amendment right to file grievances." *Perttu*, 605 U.S. at 464. The plaintiff alleged that when "he tried to file grievance forms" reporting the defendant's alleged sexual abuse, the defendant "destroyed them and threatened to kill him if he filed more." *Id*. The parties in *Perttu* agreed that "the exhaustion and First Amendment issues [were] intertwined, because both depend[ed] on whether [the defendant] did in fact destroy [the plaintiff]'s grievances and retaliate against him." *Id*. Against that backdrop, the Supreme Court held "that parties have a right to a jury trial on PLRA exhaustion when that issue is intertwined with the merits of a claim that falls under the Seventh Amendment." *Id*. at 468.

While Plaintiffs here argue that exhaustion of administrative remedies in this case may be a question of fact for the jury to decide, the Court finds that *Perttu* is not applicable to this case given that exhaustion is not intertwined with the merits of the remaining claims.

Because there is simply no genuine dispute of material fact as to whether all Plaintiffs other than Plaintiffs Hall and Rush properly exhausted their administrative remedies, summary judgment must be granted in favor of Defendants against all Plaintiffs, including *pro se* Plaintiff Anderson, except for Plaintiffs Hall and Rush.

### 2. Procedural due process

Plaintiffs assert that they were denied their right to procedural due process under the Fourteenth Amendment when Defendants confined them "to near solitary confinement without basis and without presenting Plaintiffs an opportunity to challenge the confinement." ECF No. 104 ¶ 56.

The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const., Amdt. 14, § 1. In analyzing any procedural due process claim under the Fourteenth Amendment, the first step is to determine "whether the asserted individual interests are encompassed within the . . . protection of 'life, liberty or property[,]'" and, if so, the second step is to determine "what procedures constitute 'due process of law.'" *Ingraham v. Wright*, 430 U.S. 651, 672 (1977). If there is no protected liberty or property interest, it is unnecessary to analyze what procedures were followed when an alleged deprivation occurred.

The parties dispute whether the Plaintiffs' claim implicates a legally cognizable protected liberty interest. "A liberty interest may arise from the Constitution itself, by reason of guarantees

implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (internal citations omitted). Plaintiffs in this case maintain that they were deprived of a state-created liberty interest.[10]

Procedural due process protection "for a state created liberty interest . . . is limited to those situations where deprivation of that interest 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Griffin v. Vaughn*, 112 F.3d 703, 706 (3d Cir. 1997) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). No liberty interest is implicated where the state action does not "present a dramatic departure from the basic conditions of confinement." *Sandin*, 515 U.S. at 484. The court therefore must "compare the prisoner's liberties after the alleged deprivation with the normal incidents of prison life." *See Sandin*, 515 U.S. at 485-86. In determining what is atypical or significant, the relevant comparator is the general population. *Williams v. Secretary Pennsylvania Department of Corrections*, 848 F.3d 549, 564 (3d Cir. 2017).

*Sandin* controls the disposition of the Plaintiffs' procedural due process claim here. Plaintiffs argue that the restrictions placed upon them as unvaccinated inmates in response to the DOC's segregation policy were atypical to the ordinary incidents of life at SCI-Forest and atypical to the prison life of vaccinated inmates. They argue that for approximately eight months they were

_____

[10] Defendants argue that the Plaintiffs' claim does not implicate a liberty interest directly under the Constitution itself. *See* ECF No. 169 at 5-6. It is unclear whether Plaintiffs concede this point, but they focus their briefing on the state-created liberty interest. To the extent they make an argument that they were deprived of a protected liberty interest directly under the Constitution itself, the Court finds that they were not because the record demonstrates that the conditions to which they were subjected did not exceed the sentences imposed on them. *See Sandin v. Connor*, 515 U.S. 472, 480 (1995) ("The Due Process Clause standing alone confers no liberty interest in freedom from state action taken 'within the sentence imposed.'") (quoting *Hewitt v. Helms*, 459 U.S. 460, 468 (1983) (internal quotation omitted)).

subjected to segregation that put significant restrictions on their movement and curtailed their activities at SCI-Forest, restrictions which are detailed in the factual background section of this Opinion, and that despite the reason given for their segregation as being to "minimize the risk of exposure" to Covid-19, no similar segregation policy was instituted for staff members who were allowed to work on both units and visitors were not required to provide proof of vaccination status when visiting vaccinated inmates. *See* ECF No. 196 at 16-19

The inquiry as to what is atypical or significant is "fact-specific." *Mitchell v. Horn*, 318 F.3d 523, 532 (3d Cir. 2003). Considering the conditions set forth in the factual background section of this Opinion, the Court does not find there to be a dispute as to any material fact regarding whether the conditions faced here by the unvaccinated Plaintiffs for roughly eight months were "significantly more restrictive" in comparison to the conditions in the vaccinated general population unit, and therefore the Plaintiffs' confinement in the unit for the time that the DOC's policy was in place did not present the type of "atypical" or "significant" deprivation as envisioned under *Sandin. See, e.g., Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000). The differences in conditions the unvaccinated inmates faced during this time, without more, appear constitutionally insignificant. The unvaccinated inmates were still permitted access to the yard, law library, religious activities, and programming and services, albeit not with vaccinated inmates, and, although not permitted in-person visitation, they were permitted daily phone access and increased video visits. They were also permitted to keep working, so long as they worked on GA unit, and they nevertheless received their regular pay if their ability to work was impacted by the

segregation policy.[11]  Although there appear to be disputes in the record as to whether they were permitted access to certain services and activities in the same amount of time as their vaccinated counterparts, the question in this procedural due process claim is not whether they were treated differently at all but whether the conditions of their confinement were considered to be "significantly more restrictive" than those imposed on vaccinated inmates during the time the policy was in place.  *See Shoats*, 213 F.3d at 144.  The evidentiary record suggests that their conditions of confinement did not impose an atypical or significant hardship on them in relation to the ordinary incidents of prison life and the disputes of fact noted by the parties are not material in reaching this conclusion.

Furthermore, to the extent Plaintiffs focus their argument on the open-ended indefinite duration of their segregated confinement at the time the policy was issued, this indefinite duration is not sufficient in and of itself to create a liberty interest.  *Clark v. Beard*, 918 A.2d 155, 164 (Pa. Cmwlth. 2007) (indefinite duration must be coupled with other factors in order to establish a liberty interest) (citing *Wilkinson v. Austin*, 545 U.S. 209 (2005)).  And, in any event, an unvaccinated inmate could request a transfer to the vaccinated unit at any time if he received the vaccine.

Nevertheless, the record demonstrates that the process they received was constitutionally sufficient.  "The essential requirements of any procedural due process claim are notice and the opportunity to be heard."  *Zappan v. Pennsylvania Board of Probation and Parole*, 152 F. App'x 211, 220 (3d Cir. Oct. 26, 2005).  Prior to the implementation of the DOC's segregation policy,

---

[11] It is noted that there is a dispute as to whether the Represented Plaintiffs were "denied employment" as a result of the policy, but according to Gregory Miller, the Unit Manager for GA unit during the time period at issue, Plaintiffs Hall and Rush, the only two inmates to have exhausted their administrative remedies, both held employment for some or all of the time period the DOC's segregation policy was in place.  ECF No. 170 ¶ 67; ECF No. 195 ¶ 67.

unvaccinated inmates were informed that they would be transferred into a different unit and have more restrictions placed on their movement if they elected to not receive the vaccine. Hence, they were notified of the reason for their transfer, and they were given an opportunity to receive the vaccine before their transfer, or at any time during their confinement, in which case they could request to be moved to the vaccinated unit. The unvaccinated inmates also had the opportunity to file a grievance via the inmate grievance system. *See*, *e.g.*, *Kanu v. Lindsey*, 739 F. App'x 111, 117 (3d Cir. 2018) (noting in a case involving a pretrial detainee's placement in administrative segregation that "the opportunity to respond" for procedural due process purposes, "can be satisfied by written grievances[.]") (citing *Hewitt v. Helms*, 459 U.S. 460, 476 (1983)).

This Court agrees with its' sister court, the Eastern District of Pennsylvania, that found that this same process, which was afforded to the unvaccinated Pennsylvania DOC prisoner in *Williams v. Sorber*, No. 23-CV-2982, 2024 WL 2111935 (E.D. Pa. May 10, 2024), was "sufficient to account for the interests at stake under the circumstances because the prison had an interest in preventing the spread of Covid and keeping inmates safe, and inmates were given the opportunity to either take the vaccine or, if they could not do so, accept more restrictive housing." *Id*. at *8. The Eastern District also noted that it was "unclear what additional process under the circumstances would have accomplished." *Id*.

Plaintiffs here do not specify what process, in addition to what they were given, they were allegedly due. The Supreme Court has stated that "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Marrissey v. Brewer*, 404 U.S. 471, 481 (1972). Its flexibility is "recognition that not all situations calling for procedural safeguards call for the same kind of procedure." *Id*.

23

Whether the procedures that were provided here were constitutionally sufficient requires an analysis of both the governmental and private interests that were affected.  *See Mathews v. Eldridge*, 424 U.S. 319, 334 (1976).  Taking into account both the interests of the unvaccinated Plaintiffs who were forced to choose between receiving a vaccine that they did not want or be subjected to heightened housing and movement restrictions, and the interests of the Defendants in preventing the spread of the Covid-19 virus in a communal setting at a time when the virus was still relatively new and its more contagious variants were spreading rapidly,[12] this Court agrees with the Eastern District of Pennsylvania that the process required for the transfer of unvaccinated inmates into the unvaccinated unit, which carried more restrictions, should not have been extensive.  *See Williams*, 2024 WL 2111935 at *8.  Indeed, this Court agrees that a process similar to that which is required for transfers of pretrial detainees into administrative custody, which requires only an explanation of the reason for their transfer as well as an opportunity to respond, is sufficient.  *Id*. (citing *Stevenson v. Carroll*, 495 F.3d 62, 70 (3d Cir. 2007)).

For the reasons explained, the Court finds that Defendants are entitled to summary judgment on Plaintiffs' due process claim.

### 3.  <u>Prospective injunctive relief</u>

Plaintiffs seek an injunction to enjoin the named officials from enforcing their policies and practices of segregating vaccinated inmates from unvaccinated inmates and imposing heightened

---

[12] This Court has stated that "the list of relevant considerations for [prison] authorities" attempting to control the spread of the Covid-19 virus "is long" and "the Court cannot second guess where authorities move those who test positive, those who refuse to be vaccinated, those who are more vulnerable to serious complications should they contract Covid-19, and those who recover from Covid-19."  *Jones v. County of Allegheny*, No. 21-1094, 2022 WL 2806779, at *7 (W.D. Pa. June 24, 2022), *report and recommendation adopted by*, 2022 WL 2803111 (W.D. July 18, 2022).

restrictions upon them. Defendants argue that Plaintiffs' request for injunctive relief is moot given that the pandemic conditions we faced are no longer extant and at this time no Plaintiff is incarcerated in the segregated unvaccinated unit and has not been for nearly three years. ECF No. 169 at 14-16. In response, Plaintiffs argue that this case presents an exception to the mootness doctrine because it is a question "capable of repetition yet evading review." ECF No. 196 at 19.

It is a well-established principle that federal courts do not have jurisdiction to decide an issue unless it presents a live case or controversy as required by Article III, § 2, of the Constitution. *Spencer v. Kemna*, 523 U.S. 1, 7 (1998). "This case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate . . . the parties must continue to have a personal stake in the outcome of the lawsuit." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477-78 (1990) (internal citations and quotations omitted). *See also Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (the adjudicatory power of a federal court depends upon "the *continuing* existence of a live and actual controversy") (emphasis in original). "Past exposure to illegal conduct is insufficient to sustain a present case or controversy . . . if unaccompanied by continuing, present adverse effects." *Rosenberg v. Meese*, 622 F.Supp. 1451, 1462 (S.D.N.Y. 1985) (citing *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)).

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). A court's ability to grant effective relief lies at the heart of the mootness doctrine. *County of Morris v. Nationalist Mvmt.*, 273 F.3d 527, 533 (3d Cir. 2001); *see also In re Material Witness Warrant Nichols*, 77 F.3d 1277, 1279 (10th Cir. 1996) (noting that mootness means that it would be impossible to grant the petitioner any meaningful relief on his claims). Thus, "[i]f developments

occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot." *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 698-99 (3d Cir. 1996).

An identified narrow exception to the mootness doctrine is when the "dispute is of such a nature that it is capable of repetition yet evading review." *Marshall v. Whittaker Corp., Berwick Forge & Fabricating Co.*, 610 F.2d 1141, 1144 (3d Cir. 1979). This doctrine is limited to cases where "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable likelihood that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975). In this situation, the burden of showing the issue is "capable of repetition" rests with the party opposing mootness. *County of Butler v. Governor of Pennsylvania*, 8 F.4 226, 231 (3d Cir. 2021). Another identified narrow exception to the mootness doctrine is referred to as "voluntary cessation," and occurs when a defendant argues mootness because of some action it took unilaterally after the litigation began. *Hartnett v. Pennsylvania State Education Association*, 963 F.3d 301, 306 (3d Cir. 2020). This "will moot a case only if it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Fields v. Speaker of the Pa. House of Representatives*, 936 F.3d 142, 161 (3d Cir. 2019) (quoting *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007)). In this situation, the "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal citations omitted). In their briefs, the parties understandably appear to conflate the standards involved for both of these doctrines.

However, the "capable of repetition yet evading review" exception "applies only in exceptional situations" and seemingly only when "the plaintiff's alleged injury has disappeared through no action of the defendant." *Sczesny v. Murphy*, 2025 WL 816153, at *3 n.5 (3d Cir. Mar. 14, 2025) (citing *Clark v. Governor of New Jersey*, 53 F. 769, 784 (3d Cir. 2022) (Matey, J., dissenting). Because the restrictions placed on the Plaintiffs in this case ended when the DOC lifted its policy in 2022, it appears that the voluntary cessation doctrine is the more applicable doctrine to apply here. However, it is noted that both exceptions "test[] whether there is a reasonable expectation the challenged behavior will recur." *Stepien v. Governor of New Jersey*, 2023 WL 2808460, at *3 (3d Cir. Apr. 6, 2023).

In *Clark v. Governor of New Jersey*, 53 F.4th 769 (3d Cir. 2022), a case to which both parties cite in support of their position, the Third Circuit addressed whether an action brought against New Jersey's Governor and other state officials challenging executive and administrative orders restricting indoor gatherings in response to the Covid-19 pandemic was moot. The challenged executive and administrative orders were rescinded by the governor before the case was resolved, but the plaintiffs argued that the case remained justiciable under the voluntary cessation doctrine and that the State had failed to meet its burden of showing that it was absolutely clear a return to restrictions was not reasonably likely. *Id.* at 777. In relevant part, the Third Circuit noted that "mootness concerns itself with whether the same legal controversy will recur." *Id.* at 777-78. In *Clark*, it defined the "controversy" as "(1) whether the same precise situation – the pandemic such as it presented itself in 2020 and 2021 – will occur again; and (2) whether the Governor will respond to that situation by imposing restrictions similar enough to those he

imposed in 2020 and 2021[.]"  *Id*. at 778.  It then concluded that it was "absolutely clear that neither of those aspects are reasonably likely to recur."  *Id*.

Relevant to the mootness question here the Court asks a similar question.  Will "the pandemic as it presented itself in 2020 and 2021 . . . occur again," and will the DOC respond to that situation "by imposing restrictions similar enough" to those it imposed on unvaccinated inmates at that time.  *Id*.  This Court "need not conclude it is likely that the *exact same* restrictions" at issue here will return, but it is not enough to show "*any* future COVID-related restrictions" on Plaintiffs.  *Id*. at 777.  Instead, the restriction must be "'similar' enough to the [original restriction] to present substantially the same legal controversy as the one presented" here.  *Id*.  As the party claiming mootness here, Defendants bear the burden of "demonstrating that it [is] absolutely clear that there [is] no reasonable likelihood of reoccurrence."  *Id*. at 776 (citing *Hartnett*, 963 F.3d at 307).

While Plaintiffs concede that "a global pandemic that demands lockdowns identical to Covid-19 may not ultimately reoccur," they argue that there is a reasonable likelihood that the restrictions placed upon Plaintiffs will reoccur in the event of another public health crisis and be "similar enough" to the Covid-19 restrictions to present "substantially the same legal controversy." ECF No. 196 at 20-21.  In other words, they maintain that "absent the relief sought by Plaintiffs . . . the [DOC] would have *carte blanche* authority to reinstitute mandated segregation of inmates and/or restrictions on an inmates' daily schedule based upon vaccination status, without exception or exemption."  *Id*. at 21.  Defendants do not argue or in any way suggest that if this case is resolved in their favor that they will not reimpose the same or similar restrictions on prisoners in the event of another outbreak.  Indeed, they admit that "it is impossible to definitely assert that no future

global health crisis might necessitate alterations to DOC housing policy akin to the segregated unit while any named plaintiff remains in DOC custody[.]" ECF No. 169 at 16. However, they note that "such slender possibility hardly clears the requisite bar of 'likely to suffer future injury.'" *Id*.

Plaintiffs emphasize the probability of a speculative future pandemic or health crisis in their argument, but in answering the mootness question this Court must look to the likelihood of the "same precise situation" recurring. *Clark*, 53 F.4th at 777-78 ("mootness concerns itself with whether the same legal controversy will recur[,]" which determination involves answering "whether the same precise situation" will occur again); *see also Sczesny*, 2025 WL 816153, at *3 ("Even assuming a reasonable likelihood that [Governor] Murphy will instate *some* COVID-based vaccination-policy requirement for healthcare facilities in the future, a challenge to that future requirement would not plausibly present "the *same legal controversy* as the one before us now.") (citing *Clark*, 53 F.4th at 781) (emphasis in original)). Any speculative public health crisis, and the fact that the DOC may respond with precautionary measures, including placing certain restrictions on inmates' schedules and housing conditions, "cannot itself be enough to skirt mootness, because then no suit against the government would ever be moot." *Brach v. Newsom*, 38 F.4th 6, 14 (9th Cir. 2022) (quoting *Bos. Bit Labs, Inc. v. Baker*, 11 F.4th 3, 10 (1st Cir. 2021). In addressing the likelihood of the pandemic recurring in *Clark*, the Third Circuit found that it was "absolutely clear" that the pandemic as it presented itself in 2020 and 2021 is not reasonably likely to recur. *Clark*, 53 F.4th at 778. It explained,

> [I]t is hard to imagine that we could once again face anything quite like what confronted us then. Moreover, the public health outlook has changed dramatically since the dark days of March 2020 . . . . Our knowledge of the virus and its vectors of transmission, the rollout of vaccines, and the availability of therapeutic responses to infection have totally changed the nature of the disease itself, our understanding

of it, and our response to it.  The accumulation of those changed circumstances thus make the return of the same pandemic and the same restrictions unlikely.

*Id*.  In finding that it was unlikely that the Governor of New Jersey would reimpose masking restrictions in *Stepien*, the Third Circuit reiterated its holding in *Clark* and stated that "[p]ublic health conditions have changed dramatically since the dawn of the pandemic.  Infection rates are down, vaccination rates are up, and officials have more arrows in their quiver to mitigate and treat COVID-19."  2023 WL 2808460 at *3.  Furthermore, in the prison context, the Third Circuit extended their holding in *Clark* to habeas appeals involving requests for release from state custody in light of the Covid-19 pandemic and stated that it is "unlikely" that prisoners will again face "the same pandemic conditions [] faced in 2020-21[.]"  *Kehoe v. Superintendent Huntingdon SCI*, 2023 WL 10554368, at *1 (3d Cir. Nov. 17, 2023); *see also Quevi v. Superintendent Huntingdon SCI*, 2023 WL 11051221, at *1 (3d Cir. Nov. 16, 2023); *Valdez v. Superintendent Huntingdon SCI*, 2023 WL 11197743, at *1 (3d Cir. Nov. 16, 2023).

Given the change in circumstances since the early days of the pandemic, and the fact that the Third Circuit has repeatedly found that cases challenging rescinded or lifted policies and restrictions that were imposed in response to those early days are now moot, the Court is compelled to find that the Plaintiffs' claim for injunctive relief in this case is also moot.  A challenge to any speculative future restriction based on a speculative future global health crisis simply does not plausibly present the same legal controversy as the one before the Court now.  As such, Defendants are entitled to summary judgment on this claim.

### 4.  Defendant Irwin's personal involvement

Defendants also move for summary judgment on the basis that Defendant Irwin lacked any personal involvement in the challenged conduct at issue because he did not arrive at SCI-Forest

until June 2022, after the segregation of vaccinated and unvaccinated inmates ended, and because he did not have any role in implementing or enforcing the Covid-19 segregation policy at SCI-Forest.  Given that Defendants are entitled to summary judgment on Plaintiffs' remaining claims as discussed above, the Court declines to address this final argument.

A separate Order will be entered.

Dated:  September 22, 2025.


/s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge


Cc:   All counsel of record
      (*via CM/ECF electronic mail*)

      Randy Anderson
      LY1600
      SCI Forest
      P.O. Box 307
      286 Woodland Dr.
      Marienville, PA  16239